

# NUMBER 13-18-00030-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MONICA MELISSA PATTERSON,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 370th District Court
### of Hidalgo County, Texas.

---

# OPINION

### Before Justices Benavides, Perkes, and Tijerina
### Opinion by Justice Perkes

Appellant Monica Melissa Patterson appeals her convictions of capital murder, a first-degree felony, *see* TEX. PENAL CODE ANN. § 19.03(a)(3), aggregate theft of $100,000 or more but less than $200,000 from a non-profit organization, a first-degree felony, *see id.* § 31.03(b)(1), misapplication of fiduciary property valued at $20,000 or more but less than $100,000, a third-degree felony, *see id.* § 32.45, and attempted theft of $200,000 or

more, a second-degree felony, *see id.* §§ 15.01(a), 31.03(b)(1). Patterson received an automatic life sentence for her capital murder conviction. *See id.* § 12.31(a). For the remaining counts, the jury assessed punishment at seventy-five years' imprisonment, *see id.* §§ 12.32, 31.03(f)(3)(B), four years' imprisonment, *see id.* § 12.34, and fifteen years' imprisonment, *see id.* § 12.33, respectively.

By nine issues, which have been reordered below, Patterson argues (1) the evidence is legally insufficient to support a conviction for counts one, two, and four; (2) double jeopardy bars a conviction for count three; (3) the trial court issued an erroneous charge on the law of parties and failed to instruct on the accomplice-witness rule; and (4) the trial court erroneously allowed hearsay evidence and expert witness testimony. We affirm.

## I.  BACKGROUND

Martin Knell (Martin) died in his McAllen home on January 28, 2015, at ninety-six years old. His reported cause of death was cardiac arrest. One month later, Martin's former live-in housekeeper, Celestina Mascorro, contacted the Texas Rangers claiming she had witnessed his murder. Mascorro named two individuals responsible for Martin's death: Patterson and a man named "Mario," later identified as Angel Mario Garza.

Following an investigation, Patterson was arrested on August 26, 2015. Thereafter, investigators were approached by Patterson's former employers at Comfort House Services Inc. (Comfort), a local non-profit organization, with allegations that Patterson had misapplied the organization's funds. Patterson was subsequently indicted on the same four counts that would later be sent to the jury.[1]

---

[1] Patterson was charged with (1) acting as a party to Martin's murder for renumeration, (2) unlawful appropriation over Comfort property in the aggregate value of $100,000 or more, (3) misapplication of Comfort fiduciary property in the aggregate value of $100,000 or more, and (4) attempted theft of Martin's

2

## A. Martin's Murder and Attempted Estate Theft

### 1. September 2014

In September 2014, Martin's wife of over seventy years, Thelma Mae Knell (Penny), was hospitalized. Penny was ninety-three years old. Prior to Penny's discharge, Martin appointed Greater Valley Hospice (GVH) to administer Penny's hospice care at the couple's home. Kathy Redfern, GVH Director of Nursing, testified that she ordered medical equipment to be delivered to the couple's home, and she spoke with Martin to confirm the at-home arrangement. Redfern testified that Martin provided no indication that he was ill-equipped to handle Penny returning home.

Between 10:30 p.m. and 11:00 p.m. on the evening of Penny's transport, Redfern received a call from Patterson, Comfort's administrator. Patterson told Redfern that Martin refused to allow GVH staff to move Penny back into the couple's residence, and Penny was instead transported to Comfort. Upon Penny's admittance at Comfort, Martin Knell Jr. (Mark), the couple's only child, became her established point of contact.

At trial, Mark's relationship with his parents was extensively scrutinized, and he was accused of trying to assume control of his parents' finances, which he vehemently denied. The parties also disputed whether Mark barred Martin from visiting Penny at Comfort or if Patterson alone spurred Martin's prohibition from Comfort.[2]

Mark testified that it was Patterson who, on her own accord, placed the facility on lockdown and requested law enforcement intervention, alleging that Martin was

estate in the aggregate value of $200,000 or more. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(3), 31.03(b)(1), 32.45.

[2] Mark, who lived several hours away in New Braunfels, Texas, conceded that he would stay at a hotel when visiting his parents rather than staying in his parents' home. Mark maintained, however, that there was no amount of interpersonal strain which would have prompted Mark to exclude his father from visiting his mother.

3

threatening Comfort staff. Consistent with Mark's testimony, Michael Merinos, Penny's admitting caregiver at Comfort, testified that Patterson unilaterally instructed Comfort employees not to allow Martin into the facility. Merinos testified that Patterson said Martin was a violent man who posed a threat to the facility. Patterson's statements contrasted with his own observations. When Merinos later witnessed interactions between Martin and Penny, he stated Martin appeared "very humbling, very loving—not what [he] was told that [Martin] was" by Patterson.

On September 29, two days after Penny was admitted into Comfort, Martin went to the Hidalgo County Sheriff's Office, claiming he was being unlawfully prohibited from visiting his wife. Cesar Garza, a criminal investigator at the sheriff's office, testified that he called Comfort and spoke with Patterson. She told Garza that she had filed a police report with the McAllen Police Department after Martin "threatened staff and caused a disturbance." Patterson explained that Martin was prohibited from entering the facility "because of his violent tendencies and access to weapons." Garza testified that he relayed the information back to Martin, who became "upset." As a result of Martin's response, which was not elaborated on at trial, Garza said he "had [Martin] committed" for a "mental health evaluation."

According to Brenda Lee Cantu, a representative with Adult Protective Services (APS), an agency within the Department of Family Protective Services, Patterson also reported Martin to APS, alleging elder abuse or neglect after he refused to care for Penny.

### 2. October 2014

On October 1, Cantu contacted Martin at the behavioral center where he had been institutionalized. Cantu was tasked with reviewing Martin's adult daily living situation and

4

determining whether he was capable of performing basic tasks. Cantu opined that he was.[3] Martin was discharged from the center that same day.

Once released, Martin again attempted to visit Penny at Comfort. This time, he was accompanied by Max Grubb, a pastor and long-time friend.[4] Grubb testified that upon their arrival at Comfort, Patterson told them that they would not be allowed inside because she had been "ordered by [Mark] not to allow" Martin in. Grubb then expressed his concerns to Patterson regarding rumors of Mark's alleged improper financial interest in Martin's significant fortune. Grubb testified that Patterson's demeanor thereafter changed, and Martin was permitted to visit with Penny.

On October 5, Mark informed Patterson that he would be transferring his mother to Waterford Gardens Assisted Living Facility (Waterford), pending Waterford's authorization. Mark testified that Patterson initially assured him that she would arrange for the transfer. When Mark followed up with Patterson, she told him Lucille Cavazos, Waterford administrator, had denied the transfer. At trial, Cavazos rebutted Patterson's claim. Cavazos stated that Patterson never gave her the opportunity to evaluate Penny for placement. "[Patterson] said that I might not be able to handle [Martin]—that he was having to go visit, escorted by a policeman, because he had threatened the [Comfort] facility," said Cavazos. Patterson insisted that she "needed to ask the family for permission" before she would allow Cavazos to evaluate Penny in person for placement suitability—although Mark, who was still listed as Penny's primary point of contact, supported the transfer.

---

[3] APS closed its case involving Martin at the end of October after concluding there were no financial, mental, or physical concerns.

[4] Grubb testified that Martin and Penny were former parishioners at his church, that he had known the couple since 2005, and that they spent several holidays together at the couple's home.

5

Within one week of Mark's transfer request, (1) Mark was removed as Penny's primary point of contact at Comfort and replaced with Martin, and (2) Patterson accompanied Martin to Chase Bank to inquire about withdrawing Martin's money. According to Rocio Perez, a Chase personal banker, Patterson and Martin asked if there was a "way to keep the money safe from [Martin's] son." At the time, Martin had approximately $600,000 in his account. Perez, who was familiar with Martin[5] and had never known him to make such a large withdrawal, grew concerned during the encounter and contacted Global Security Investigations to report possible elder abuse.

Patterson's heightened interest in Martin's finances was further corroborated by Grubb, who testified that in early- to mid-October, Patterson approached him with a "proposal about taking care of Martin's money." Grubb said Patterson suggested that "Martin take his money out of the bank and give it to her. And she would protect it . . . ." Grubb vocalized his disapproval, and in response, Patterson proposed she and Grubb split the money. Shortly after this exchange with Patterson, Grubb testified that he convinced Martin to meet with a local attorney, Oscar Gomez.[6] Grubb soon underwent open heart surgery and lost contact with Martin for several months.

On October 13, Martin withdrew $100,000 from his Chase account. One week later, Martin, again escorted by Patterson, attempted to make another significant cash withdrawal. Chase Bank branch manager Amador Lopez Jr. testified that the bank did not

---

[5] "[Martin] was a well-known customer," Perez said. "If there was [sic] no customers, then he would come into my office, and just talk about what was going on with his life." Perez testified that she used to join Martin and Penny for lunch, and more recently, after Penny was transferred to hospice and Martin had been institutionalized, Perez's husband helped Martin get his car back from the impound lot.

[6] Gomez testified that though he met with Martin on more than four occasions, he did not ultimately provide any legal services to Martin, citing a conflict of interest. Gomez said that for the exception of the first meeting, when Grubb joined him, Martin arrived alone and without an appointment. "[H]e would show up just to chat. And I said, 'You know, Mr. Knell'—'You know, this is gonna be expensive'. He just [said]—'Oh. I'm paying you. You sit there, and you listen to me.'"

fulfill Martin's request to withdraw $150,000 that day. Lopez did, however, become familiar with Patterson, who soon after opened an account at Chase Bank and received multiple transfers from Martin's account.[7] According to Lopez, Martin's balance at the beginning of October was $600,046.78. By the end of the month, Martin's account reflected $189,589.97.

On October 28, Penny passed away. Three days after Penny's funeral, Raquel Ybarra, Penny's former medical social worker at GVH, visited Martin at his home to offer bereavement counseling services. Ybarra noted that Martin "appeared to be coping well," with a strong support system in place, which included his family and pastor. Mark confirmed that he spoke with his father frequently after Penny passed, often multiple times a day.

### 3. November 2014

On November 24, during a follow-up bereavement visitation, Ybarra testified that the visitation atmosphere "[u]nexpectedly" changed after Martin received a letter indicating Patterson's name had been added as a transfer on death title to his stockholder account. "[Martin] became very angry. . . . His voice was trembling and really loud," described Ybarra. Martin told Ybarra that he had trusted Patterson "with his money and his stocks information . . . [and that] Patterson was holding $300,000 for him."

Ybarra watched as Martin called Patterson, demanding that she "come now" to his home. Martin then contacted the stockholder company and was inquiring about the unauthorized changes when Patterson arrived at the residence. He asked Patterson to

---

[7] Lopez testified that Patterson, at some unspecified point, requested a meeting with him and though unprompted, began "pleading her case—that the money was received legitimately." Patterson later withdrew the money, citing "legal advice" that she had received, said Lopez.

speak to the customer service representative and revert any changes she previously made without his permission. At the end of the phone call, however, Patterson's changes remained in effect.

Ybarra said Patterson attempted to deflect Martin's concerns by asking Martin if he had taken his medication. Martin then accused Patterson of "undermining him and maybe conspiring with his son to get his money." He told Patterson he wanted his "$300,000 back from her." Patterson refused to address Martin's allegations, claiming she would not discuss any "privileged information in front of [Ybarra]." As Ybarra gathered her belongings to leave, Patterson asked Ybarra to have her GVH supervisors, Redfern and Danielle Martinez, contact her.

Based on the report Redfern received from Ybarra, coupled with prior documented concerns,[8] Redfern contacted APS, the Texas Attorney General, and the Better Business Bureau. A police report was also filed, and an investigator with the McAllen Police Department was dispatched to Martin's home the following day.[9]

Martinez thereafter contacted Patterson at Comfort. Patterson informed Martinez that Ybarra had simply observed Martin "in a moment of anger and confusion, and [sic] had to remind him of what he wanted her to do." Patterson spoke cyclically, maintaining that "it was a legal issue, that she could not speak to me in detail, but there were lawyers involved," said Martinez. Martinez testified that it was a "very unorthodox and odd

---

[8] Martinez testified that she considered Patterson's pronounced involvement in Martin's affairs inappropriate, stemming back to when "[Martin] was led to believe that [Mark] made the report [excluding him from Comfort] when it was, in fact, [Patterson]."

[9] Investigator Steven Medrano testified that Martin "seemed to be confused about events, time." Medrano's suspicions were further piqued when Martin identified himself as being sixty-four years old. Martin was ninety-six. Medrano staffed the case with a supervisor, who resolved to refer the matter to APS.

8

conversation," and consequently, she documented the discussion and subsequent discussions with Patterson in significant detail.[10]

Ybarra testified that Martin separately contacted her to apologize, telling her that "it was all a misunderstanding" and that Patterson would be returning his $300,000 to him.

### 4. December 2014

In early December, Mark observed a change in his father's demeanor. When asked to expound on his testimony, he surmised only that his father's attitude was "horrible." Mark last spoke with his father on December 3rd.

On December 7, Jose Quintanilla, a then-investigator for APS, testified that he visited Martin's residence to investigate a report of elder exploitation—the second APS report involving Martin in a six-month period.[11]

The following day, Martin sought out local attorney Mark Talbot under the direction of Patterson, who made the appointment and accompanied him to the meeting. At the December 8th meeting, Martin executed a medical power of attorney, a HIPAA medical disclosure, and a directive to physicians—designating Patterson as his primary agent on all forms. Talbot inquired whether Martin wanted to execute the documents outside Patterson's presence, which Martin declined. Talbot testified that he believed Martin had "no problem communicating with him or understanding him." Talbot received letters from Dr. Jose Igoa, a "well-known psychiatrist in Hidalgo County," and Dr. Luis Arango,

---

[10] Several hours later, Martinez received a phone call from Patterson's personal cell. Patterson passed the phone to Martin, who said that "he didn't want 'this lady' to get in trouble for—or for the 'Comfort House to get shut down'. . . . He [said] that 'this lady, although I can't remember her name, but I know her face, has been there to support me, and her smile lights up my day.'" Martin then began discussing his personal visitation matters with his son and extended family. "I was a bit confused, but wasn't allowed to clarify," said Martinez. She noted continuous "whispering in the background," followed by redirection in the conversation.

[11] The second APS case would remain dormant until after Martin's death.

9

Martin's primary physician, confirming Martin's competency. On December 12, Martin executed a financial power of attorney, also naming Patterson as his agent.

On December 16, Ybarra attempted to visit Martin at his home and received no response. Martin called Ybarra the following day to discontinue bereavement services, claiming that "[h]e did not have enough time" and that a written confirmation would follow.[12] Martin was subsequently discharged from the agency's services.

Martin's Last Will and Testament was signed on December 22, with Patterson designated as the executor and beneficiary of two of Martin's properties and the residue of the estate. The next day, Martin sustained a fall in Patterson's home while showering. Erika Garcia, a registered nurse at Proficient Home Care Solutions, who was responsible for recertifying Martin every sixty days for service eligibility, testified that physical therapy was ordered for Martin following his fall. "[H]e was weak. . . . [H]e was needing the furniture and chairs to hold him up. His—[h]is gait was very unsteady," said Garcia. One week later, Patterson called Garcia to cancel physical therapy because Martin had recently learned his cancer was spreading.[13] According to Garcia, Martin had been previously diagnosed with atherosclerosis, coronary artery disease, heart hypertrophy, and myocardial fibrosis.

Between late December and early January, Mascorro began working for Martin as a live-in housekeeper on weekdays; Patterson would relieve her on weekends. Mascorro

---

[12] Redfern and Martinez testified that the agency received a typed letter, wherein Martin apologized about the dispute that the GVH "got caught up in." Martin also alleged that he had been disturbed by a GVH representative, who had been in his home for an "excessively lengthy" period, inquiring about his financial matters. Martinez described the letter as "odd", seeing as Martin previously told her that he "did not know how to use a computer, [and] did not own a computer." Martinez followed up on Martin's allegation and determined it was unsupported by the agency's employee logs.

[13] Martin was diagnosed with stage three multiple myeloma in 2012 and underwent treatment. Martin's medical records admitted at trial indicate he was asymptomatic in June 2014.

testified that she was responsible for bathing Martin, "clean[ing] around the house," doing laundry, "fix[ing] his meals," and "dr[iving] him around." Mascorro said that Patterson instructed her on how to care for Martin and ensured Mascorro intercepted all phone calls to Martin. Mascorro testified, "[Patterson] wanted me to let her know whoever called. . . . Make sure that they wouldn't—the sons or . . . the grandkids—they weren't supposed to talk to [Martin]."

At an unspecified point in time, Mascorro met Mario, a man whom she only knew as a Comfort contracted handyman.[14] Mascorro testified that she had seen Mario at Martin's residence on two prior occasions: to deliver a hospital bed and to fix a leaky shower head.

### 5. January 2015

On January 5, 2015, Martin designated Patterson as the "pay upon death" (POD) beneficiary for his Chase Bank accounts.[15] On January 13, Patterson accompanied Martin to Chase Bank. Maria Del Pilar Zuniga, a Chase teller, testified that she was familiar with Martin, and she distinctly recalled Martin inquiring about POD accounts for safety deposit boxes. Martin told her that "he had met this wonderful woman— [Patterson]—and that he trusted her with his life." Zuniga informed Martin that safety deposit boxes could not have assigned POD beneficiaries, and Martin thereafter requested access to his safety deposit box; he was joined by Patterson.

---

[14] According to Comfort employee, Lyana Benavidez, Mario began "volunteering" at Comfort in September 2014, after his father was admitted as a patient. Benavidez testified that Mario and Patterson reached an arrangement, allowing Mario's father to remain at Comfort in exchange for Mario working at Comfort because "they just could not afford home care" otherwise. After Martin passed away, Mario abruptly stopped volunteering.

[15] Maria Del Pilar Zuniga, a teller at Chase Bank, explained that a Payable on Death (POD) is an arrangement which gives a pre-approved individual access to a specified account provided that the individual has the appropriate beneficiary designation documentation and proof of the account owner's death. POD circumvents the probate process, said Zuniga.

Testimony was also elicited regarding Martin's health in January 2015. Martinez testified that Patterson told her during a Comfort event that Martin was "bedbound," "very ill," and "no hospice would accept him," which Martinez said made no sense given the nature of hospice facilities. Meanwhile, Merinos testified that he saw Martin the day before his death, and he did not perceive any signs of his imminent passing, such as "mottling," "breathing changes," "lack of appetite," or "immobility."

Martin's homecare nurse, Gloria Hernandez, shared Merinos's observations. Hernandez examined Martin on the morning of his death.[16] Hernandez testified that she arrived at Martin's home around 8 a.m., checked his "temperature, his respiration, his pulse, his heart rate, and his blood pressure," and she reported that "[a]ll vitals were stable." There was "no respiratory/cardiac distress" noted, and Martin denied any complaints of chest pain, shortness of breath, or other cardiac arrest symptoms. Hernandez described Martin as "alert and oriented" although he struggled with "poor endurance" and an "unbalanced gait." Hernandez left the residence at approximately 8:30 a.m.

Between 8:30 a.m. and 9:30 a.m. on January 28, there was conflicting evidence concerning Patterson's whereabouts. Lyana Benavidez, a Comfort administrative assistant hired by Patterson in September 2014, testified that she saw Patterson at work by 8:30 a.m. on January 28th, which she claimed was out of the ordinary because Patterson would normally get to the office around 10 or 11 a.m.

Meanwhile, Mascorro testified that Patterson arrived at Martin's residence shortly after Hernandez departed—on the heels of a heated phone call with Martin. Mascorro

---

[16] Hernandez began treating Martin in 2014, shortly before Penny's death. She went to his residence once a week to administer a vitamin injection.

described a livid exchange between Patterson and Martin, during which, pursuant to Martin's demands, Patterson ordered Mascorro to retrieve Martin's keys to his filing cabinet. Mascorro handed the cabinet keys to Martin, and Patterson immediately instructed her to leave the home. Mascorro testified that she was in the driveway of Martin's residence when Mario, who was seated in Patterson's vehicle, startled her. Mascorro asked him what he was doing there, to which he replied, "Did [Patterson] tell you?"[17]

Mascorro testified that she looked up to see Patterson "gestur[ing]" for Mario to come inside. Mascorro witnessed Mario exit the vehicle, "pull out some gloves from his back pocket," and enter the residence, while Patterson hung back for a few moments before joining him. Mascorro followed Patterson back inside the home. "[T]hen, by the time I got there, I heard—I heard [Martin]—[Martin] was—He was being smothered." Mascorro said she felt as if she was "[un]able to move."

According to Mascorro, Patterson said, "I had to put him to sleep because he was accusing you of stealing." Patterson ordered Mascorro to clean the doorknobs and wait thirty to forty-five minutes before calling the police. Patterson forbade Mascorro from

---

[17] On the evening before Martin's death, Mascorro testified that she received an unprompted phone call from Mario. Mascorro claimed she never gave Mario her number, and she was disturbed by this unwanted communication. Mascorro promptly contacted Patterson, who assured her via phone call that everything was fine. Mascorro testified that she then texted Mario, cautioning him not to come over to Martin's residence because "the cops were passing by." When asked at trial what prompted her to reference the police via a text message, Mascorro stated it was "because [she] was scared" and provided no further insight.

On cross-examination, Mascorro was confronted with Mario's phone records, which indicated that Mascorro called Mario first on the night before Martin's death. The records also detail four additional calls from Mascorro to Mario that same evening. The details of Mario's phone records, however, differed from Mascorro's phone records, which were also introduced at trial. Although both records confirm Mascorro called Mario five times between 7 and 8 p.m., Mascorro's phone records dictate that she was the recipient of an inbound call from Mario before she initiated the subsequent communications. There were no reported phone calls between Mario and Mascorro on the day of Martin's death, nor were there any reported phone calls between Mario and Patterson.

13

mentioning her presence at the residence. Mascorro said she was told by Mario that he would be "watching" her, and she overheard him call someone to pick him up.

Once Patterson and Mario departed the residence, Mascorro entered the home to find Martin "with his face forward in a sitting position" at the kitchen table. Mascorro placed a call to 9-1-1, followed by a call to Patterson, as she had been instructed to do. When asked why she waited to report what she had witnessed to law enforcement, Mascorro said it was because she knew Patterson was "politically involved," and she "didn't want this to fall in the wrong hands."[18]

At 9:42 a.m., the McAllen Fire Department arrived at Martin's residence. Eric Espinoza, a driver with the department, testified that a housekeeper ushered him to where Martin was lying on the floor next to the dining table. Mid-resuscitation efforts, the housekeeper handed Espinoza a phone. Espinoza testified that an individual on the phone told him that there was a Do Not Resuscitate (DNR) order "for this patient, and for us not to touch him." Per department policy, Espinoza notified the woman that any DNR needed to be present before the department would cease resuscitation efforts.

Med Care EMS personnel arrived at 9:49 a.m. and moved Martin to the ambulance, where he was intubated and intravenous fluids were started, said Dinora Mendoza, a Med Care paramedic. Although Martin had no pulse, "[h]e was warm," testified Mendoza. Soon after, Mendoza heard knocking on the ambulance side door, and a woman later identified as Patterson handed paramedics the DNR paperwork. Martin's cause of death was listed as cardiac arrest.

On the day of Martin's funeral, Mark asked Patterson for permission to go inside

---

[18] Patterson is the daughter of a former county commissioner and sister to a local county court at law judge.

14

his father's home. Patterson declined, and a verbal altercation escalated, stopping only when Patterson abruptly walked away. Patterson returned with a single piece of paper entitled "Last Will and Testament." Mark testified, "It had been redacted. Only had my dad's name at the top, and [] Patterson's name at the bottom, as executrix." Mark requested the unredacted version, but Patterson told him that he would "have to get it from the attorney," and she refused to provide the name of the attorney.

Grubb,[19] in attendance at Martin's funeral, said he took the opportunity to speak to Mark privately. Grubb testified he told Mark he felt that Patterson had "manipulated [Martin] to take his money from him." Grubb disclosed that Patterson had told Martin that Mark was "filing motions for incompetency of him, to take control of him and his estate."

### 6. The Investigation

On February 24, 2015, four months after APS was contacted by GVH and the local sheriff's department regarding allegations of elder exploitation, Juana Isabel Caro, a supervisor with APS followed up on the case. Caro testified that she contacted Patterson, who stated that "she had been cleared by her board—even though I didn't ask—I wasn't asking about that." Patterson maintained that she had "nothing to do with [Martin's] finances" and denied knowing who held the financial power of attorney. Caro testified that she later learned that Patterson "was [Martin's] agent to act [o]n his behalf in matters pertaining to his finances, property, banking, estate, trusts, other beneficiary transactions."

---

[19] Grubb received $100,000 from Martin's estate. On cross-examination, defense inquired whether Grubb was only inclined to help Martin in late 2014 because he had been financially incentivized to do so. Grubb denied any other motivation other than his desire to act as Martin's spiritual advisor. "That's why I wanted him to see a lawyer—to protect his interests. Because I told him, 'It's way beyond my pay grade to help you on [financial matters].'"

On the same day that APS began following up on its case, Mascorro contacted the Texas Rangers. Mascorro spoke to Ranger Robert Callaway, and the two spoke in "excess of ten hours" that day. He described Mascorro as "visibly distraught, very emotional." As part of his investigation, Callaway testified that he also spoke with, among others, Martin's neighbors, APS, Comfort staff and board members, Martin's son, and Patterson. Callaway obtained banking and phone records in an attempt to "confirm, or to prove, or disprove the information that we were being told by the different witnesses, including [Patterson]."

### a. Patterson's Phone Records

A review of phone records placed Mario, Patterson, and Mascorro's "cellphones in the vicinity of [Martin's] residence starting at around 8:00 a.m. in the morning," approximately one hour before Callaway stated he had "initially been led by [Patterson] to believe she was there."

Patterson's phone records also provided additional suspect information, said Callaway. On the morning of Martin's death, Patterson placed a phone call to Herbierto Suarez, a "handyman" she had contracted on behalf of Comfort and with whom she was having an affair. The 6:21 a.m. phone call spanned forty-five minutes. When confronted with phone logs and text messages at trial, Suarez denied having any recollection of a phone call the morning of Martin's murder, although he did recall Patterson later telling him that Martin had passed from natural causes.[20] Suarez was also unable to remember whether Patterson had texted him that (1) "today was a perfect day" on October 22, the

---

[20] Suarez confirmed the peculiarity of Patterson's interest in Martin, testifying that though "a lot of people [] die" at Comfort, Patterson had never texted him regarding the death of any other former Comfort patient or family member of a former Comfort patient—apart from Martin and Penny.

16

same day Martin withdrew $150,000; and (2) a situation involving "lots of documents" had gone "better than she thought" on December 8, the day Martin made Patterson the executor of his will. Suarez did recall, however, that prior to Martin's death, Patterson told him that Martin was going to leave his estate to her. "He was gonna change it to her," testified Suarez.

### b. Patterson's Recorded Statements

Pursuant to his investigation, Callaway asked Mascorro to make a "consensually recorded phone call between her and [Patterson]" on June 28. The phone call revealed no information, said Callaway. "Patterson didn't admit to anything, nor did she deny causing any harm to [Martin] on January the 28th."[21] Mascorro, at his direction, placed a second call to Patterson, and the two agreed to meet at a local Whataburger. Recordings of the phone calls and the Whataburger meeting were admitted into evidence at trial, over Patterson's objections.[22] "Again, there was no confession, but there was no denial of harming [Martin] either" during the Whataburger meeting on July 5, testified Callaway.[23] Patterson did, however, "place[] herself and [Mario] at the house prior to the time she had told me," said Callaway. Patterson claimed she was there with Mario to fix the shower, which is why she instructed Mascorro to wait outside.

Patterson later confided in Comfort employee Merinos regarding the Whataburger confrontation. Merinos testified that he told Patterson that he believed Mascorro was

---

[21] During the first phone call recording, Patterson is heard repeatedly stating that she "need[ed] to see [Mascorro] in person" and that she "[could] not talk over the phone." Patterson reiterated offers to drive to Mascorro to talk in person. Mascorro declined to disclose her location to Patterson.

[22] The recordings were admitted alongside an explicit oral instruction by the trial court that the jury was not permitted to consider Mascorro's statements for the truth of the matter asserted. Only statements made by Patterson were "admitted for all purposes."

[23] Contrary to Callaway's testimony, a review of the Whataburger recording indicates Patterson maintained that she did not harm Martin and that he died from a "heart attack."

"wearing a wire" based on Patterson's depiction of events. According to Merinos, Patterson then asked him to drive her to a payphone so she could contact Mario. Patterson claimed "she couldn't call [Mario] because they're gonna trace her." Merinos overheard Patterson tell Mario, "They're gonna be looking for you. Make sure you hide." When Merinos asked Patterson for an explanation, Patterson stated only that "it was because of [Mario's] immigration status." She did not elucidate further.

Benavidez, the same Comfort employee who testified to Patterson's whereabouts on the morning of Martin's murder, also spoke of an unprompted disclosure by Patterson following Martin's death. Patterson approached Benavidez, requesting spiritual guidance concerning forgiveness and God. Benavidez, a self-identified religious individual who remains close to Patterson, maintained that she did not perceive Patterson's inquiry as unusual.

### c.      Martin's Autopsy

On August 24, 2015, Martin's body was exhumed, and an autopsy was performed by Norma Jean Farley, Hidalgo County forensic pathologist. Farley testified to her credentials as an expert and the methodology she employed. Farley stated that she did not detect "petechiae," a medical condition often seen in individuals who are strangled. Farley explained, however, that physical evidence in certain asphyxial deaths, in deaths where oxygen is cut off from the brain, is often difficult to find. "We may not get those little hemorrhages in the eyes, and there may not be any hemorrhage in the neck muscles either, especially in a manual type of strangulation, and if the person is intoxicated—so they're not struggling as much—or if they're frail," said Farley. Pillowcases, towels, and curtains—any items that are soft—may also be used to mask suffocation because they often do not leave an indentation or cause trauma on the skin, opined Farley.

18

Farley confirmed the medical presence of several of Martin's pre-diagnosed conditions, including mild to moderate coronary artery disease, cardiovascular disease and osteoarthritis or degenerative joint disease—and testified why she did not attribute any of these conditions as the cause of death. Farley also ruled out multiple myeloma, Martin's cancer diagnosis from 2012. Although Farley capitulated that "nothing at autopsy goes along with a suffocation case," Farley concluded Martin's death was "asphyxia by suffocation," basing her medical opinion on information received from Martin's medical records and investigative agencies.

### d.    Martin's Money

According to Ranger Callaway, tracking an amount of money in excess of $600,000 removed from Martin's accounts posed the largest hurdle for investigators. Adam Palmer, investigator with the Hidalgo County Sheriff's Office, testified that based on a review of Martin and Patterson's Chase Bank records, Patterson transferred $222,283 from Martin's account into her own shortly after Martin's death, and within months, it was depleted. Moreover, stacks of cash in Martin's safety deposit box, which indicated monies he wished to leave certain individuals, contained less than their reported face value. For example, said Palmer, one stack had "to [Grubb] $100,000" written on it, and only contained $73,528. Another stack, indicating it was for Comfort and contained $100,000, only had $81,887. The safety deposit box log revealed only three recent access dates: September 11, 2014, October 21, 2014, and January 13, 2015, with Patterson seen in bank surveillance footage joining Martin on the later date.

Ranger Callaway testified that several search warrants were executed to "determine what happened to all that cash," but to no avail. In the course of his investigation, however, Callaway found that Patterson had an unpaid federal tax lien in

19

the amount of $205,183.21 for a former failed business venture. During cross-examination, Callaway was asked, "What do the taxes have to do with the murder of [Martin]?" Callaway responded, "Well, it shows that the defendant needs a large amount of money to pay off those tax liens"—implying Patterson's motive for murder.

In late August, Ranger Callaway executed an arrest warrant for Patterson. Callaway subsequently tried to reach out to Patterson's mother but determined that she had taken a one-way flight to Cuba "within a week or two after [Patterson] was arrested."

## B.    Comfort Theft and Misappropriation

Patterson's alleged improper spending of Comfort funds between 2014 and 2015, including the unauthorized creation of a Comfort checking account at Falcon Bank in April 2014, was also at issue at trial.

In January 2014, Patterson was hired as the lead administrator for Comfort, a ten-bed, licensed non-profit facility for terminally ill residents. Patterson was responsible for managing Comfort's finances and raising the non-profits' visibility within the community, explained Carol Hansen, a former Comfort employee. Hansen worked in the financial department at Comfort for seven years and resigned six weeks after Patterson was hired.[24] According to Hansen, Comfort only operated out of two bank accounts—neither of which was through Falcon Bank.

Shortly after Hansen resigned, Patterson promoted Melissa Chavez, a certified nursing assistant from caregiver to administrative liaison. Chavez testified that she became tasked with reviewing bank statements to track expenditures and to ensure

---

[24] Hansen cited her tumultuous relationship with Patterson as her reason for leaving the facility, claiming Patterson touted her "connections" with local law enforcement and "threatened" to go through her office "with a fine-tooth comb" to "find something" to warrant terminating her.

20

Comfort records in QuickBooks, the facility's accounting software, were accurate. Chavez was not aware of any Falcon Bank account.

During direct examination, Chavez discussed one instance of coming across an unusual expense: a gym membership. Chavez testified that Patterson told her that she had inadvertently used Comfort's debit card. The gym membership expense was a recurring charge on the Comfort account, which Chavez said Patterson never remedied. In less than six months, Chavez requested that she return to her position as caregiver though the change included a reduction in salary, broadly citing her discomfort in any role involving responsibility for the organization's finances. After Chavez was demoted, she retained the title of "finance director." Chavez told Patterson that she "didn't want the title." Patterson reportedly asked Chavez why she could not "just be happy . . . playing the part." Chavez left Comfort in July 2014.

Amidst the changes to finance staff at Comfort, Patterson hired Gonzalez CPA & Associates to conduct an audit. Patterson had been referred to Gonzalez CPA by Lourdes Suarez, a contracted staff member at Comfort and wife of Heriberto Suarez. Lourdes also worked at the CPA firm. Melissa Gonzalez,[25] a public accountant with Gonzalez CPA, said the firm was contracted to conduct two audits.[26] Regarding the first audit, Gonzalez looked at financial records between July 1, 2013, and June 30, 2014. Gonzalez notated a drastic change in the investment account compared to the prior year. Gonzalez said the auditing also revealed questionable "small amount" purchases that were cleared when Patterson claimed the purchases had been for fundraising purposes.

---

[25] Gonzalez testified that she was unaware that Lourdes, her first-cousin, had been working in the finance department at Comfort. Gonzalez opined that was a clear conflict of interest.

[26] Patterson was arrested the following year, mid-second audit, and the firm was instructed their services would no longer be needed by the then-Comfort board president.

21

At trial, Gonzalez was asked why her auditing failed to include any mention of a Falcon Bank account. Gonzalez was confronted with a copy of Comfort board minutes, which approved the opening of a new checking account for daily operating expenses; the account was opened by Patterson at Falcon Bank on April 9, 2014. Gonzalez testified that she was unaware of its existence. Several days later, Gonzalez was re-called to testify. Gonzalez explained that after testifying initially, she reviewed Comfort's file at her office and found that the original minutes her firm had been given by Comfort "did not coincide with the minutes that [she] was asked to look at here, when [she] testified." The document admitted at trial by defense contained the following language, which did not exist in the firm's copy of Comfort's minutes:

> Open new business checking. Melissa Patterson was instructed by the Board to open a new business checking account listing her [as] primary signer. This account will be utilized for daily operating expenses and therefore, bank of choice should be within close proximity to the Comfort House.

The firm's copy of Comfort's minutes included no provision regarding the board's approval or acknowledgment of a new checking account, said Gonzalez.[27]

Carolyn De Witt with the Texas Department of Public Safety, Intelligence and Counterterrorism Section, testified that based on her review of Comfort's Falcon Bank records, Patterson unilaterally opened the account in April 2014 using Comfort's IRS exemption identification number.[28] According to De Witt, the unauthorized expenditures from the Falcon Bank account totaled $36,464.76.

---

[27] On cross-examination, defense attorneys questioned Gonzalez's motives, accusing her of altering her testimony after she had come to learn that Patterson was the woman who had been having an affair with her cousin Lourdes's husband.

[28] As part of her investigation, De Witt also reviewed Comfort's other bank records and submitted a spreadsheet of her findings to Ranger Callaway.

Board members during Patterson's tenure also testified regarding the disputed authorization of the Falcon account and Patterson's history of nondisclosure with the board. Margarito Trujillo and Timothy Brown were already on the board when Patterson was hired. Unlike under Hansen's tenure, where "every penny" would be accounted for and each board member would receive expenditure printouts at monthly meetings, Patterson never provided the board with any of Comfort's financial records, said Trujillo.

The men also testified as to having a turbulent relationship with Patterson[29] and denied approving Comfort monies for Patterson's personal use, including Patterson's trip to Las Vegas in November 2014.[30] Brown testified that Patterson was "well aware" of what she was allowed and not allowed to spend money on behalf of Comfort. For example, Brown said any checks over $1,000 had to be signed by one of the board members. However, there were no written policies in place.

In 2015, Paul Garcia and Omar Guevara joined the board at Patterson's behest. Garcia, as board treasurer, said he inquired on bank statements several times, and Patterson always had an excuse as to why she could not provide any detailed reports. According to Garcia, Patterson said the issue was with the bank. Guevara was

---

[29] Trujillo recalled one incident when he had gone by Comfort around noon, and no one was present. Trujillo later received a phone call from Patterson, demanding to know "why do I question her— her employees and operation." Patterson then threatened to "get [Trujillo] off the board." Trujillo said he stopped visiting the Comfort office after that encounter.

Brown testified that he felt "unwelcome" after he reported Patterson to APS following an anonymous complaint regarding Patterson and her relationship with a patient. Patterson asked Brown to "quit the board," and Brown eventually resigned in early 2015, despite having "more history with the Comfort House than anybody that was there at the time."

[30] Flight tickets were purchased in the amount of $2,984 for Patterson, Suarez, Patterson's mother, and Martin, who was unable to attend. Hotel stays were also charged to the Comfort account. Suarez confirmed he and Patterson had taken multiple trips together in Fall 2014 and Spring 2015, including the trip to Las Vegas and hotel stays in-state. Patterson was also responsible for helping Suarez get his "truck fixed up" and bring him current on his property taxes. Suarez testified that Patterson provided him with $1,000 via a direct deposit for his truck and $10,000 in cash for his taxes. He was unaware of how Patterson obtained these funds.

responsible, in part, for "oversee[ing] the operations in conjunction with [Patterson]" and repeatedly requested "QuickBook printout[s]" at the board's monthly meetings only to be told by Patterson that "QuickBooks was down." Neither individual was ever shown any financial documentation relating to Comfort by Patterson, and neither approved of Patterson's use of Comfort monies for her son's graduation party in April 2015.[31]

After Patterson was arrested, Guevara tasked himself with conducting an internal, informal audit. Guevara testified that he scoured through Patterson's old office, gathering receipts found in Ziploc bags and documents reflecting "expenses that [the board members] were not aware of at the time." When asked to describe specific items he determined had been purchased with Comfort monies for the personal benefit of the defendant, Guevara listed the following expenses: Patterson's son's graduation party, flights to Las Vegas for four persons, a hotel room in Las Vegas, a gym membership, car rentals, and miscellaneous restaurant expenses.[32] Guevara testified that apart from a car allowance, Patterson was not given a dinner allowance, and she did not have authority to travel "outside the Valley" on Comfort accounts. Guevara estimated that unauthorized expenditures totaled $21,056.67 for 2014 and $36,188.65 for 2015—not including the

---

[31] Patterson arranged an elaborate graduation party for her twenty-one-year-old son. Approximately 300 people were in attendance, including several board members. Multiple individuals contracted by Patterson for the party testified at trial. Expenses paid by Patterson with Comfort monies included $2,000 for a lighted dance floor, $4,680 for a location, tables, and chairs, $6,900 for catering, $3,495 for lounge sets and linens, $1,623 for audio and lights, $1,646 for valet parking for guests, and $650 for photography. Total expenses charged to Comfort for this event exceeded $20,000.

[32] Guevara's spreadsheet, which provided a chronological list of all unauthorized expenditures by Patterson, was admitted at trial. The spreadsheet contained several typographical errors. Guevara testified to one such "typo": a charge for Chick-fil-A on July 9, 2015, in the amount of $19,385.

24

$36,464.76 in expenditures from the Falcon account.[33] Guevara reported his collective findings during a board meeting.

On November 23, 2015, Patterson and Comfort entered into a settlement agreement, which contained a "[n]o admission of liability" provision and required Patterson to pay $70,000 to Comfort. Guevara thereafter reported Patterson to local law enforcement.

Callaway testified that in the course of his investigation, he did not independently confirm the alleged illegitimacy of individual expenditures reported. Callaway based his investigation on Guevara's and De Witt's documented calculations, which were supplemented by bank statements and receipts.

The jury returned a guilty verdict on all four counts. This appeal followed.

## II.    COUNT ONE: CAPITAL MURDER

### A.    Sufficiency of the Evidence

#### 1.    Standard of Review and Applicable Law

By her first issue, Patterson argues the evidence does not support her conviction for capital murder. We consider the evidence in the light most favorable to the verdict to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Chambers v. State*, 580 S.W.3d 149, 156 (Tex. Crim. App. 2019); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In our analysis, we give deference to "the responsibility of the trier of fact to fairly resolve conflicts in

---

[33] In it's brief, the State points to an exhibit prepared by De Witt, totaling Comfort's expenses at $68,944.10, which when calculated in conjunction with the Falcon Bank account expenses, exceed the $100,000 minimum required by statute. *See* TEX. PENAL CODE ANN. § 31.03(b)(1).

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04. When the record contains conflicting inferences, we presume that the trier of fact resolved any such conflicts in favor of the prosecution, and we must defer to that resolution. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010). Additionally, we treat circumstantial evidence as being equally probative as direct evidence. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

### 2.    Analysis

Under the Texas Penal Code, for the purposes of these allegations, a person commits the offense of capital murder if she: (1) intentionally or knowingly caused the death of an individual, and (2) "commit[ed] the murder for remuneration or the promise of remuneration or employ[ed] another to commit the murder for remuneration or the promise of remuneration." TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(3).

Though the penal code does not define "remuneration," the Texas Court of Criminal Appeals has made clear that remuneration "encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or

received because of some act." *See Beets v. State*, 767 S.W.2d 711, 734 (Tex. Crim. App. 1987, op. on reh'g). In *Beets*, the court of criminal appeals concluded that § 19.03(a)(3) is inclusive of situations where "an individual commits a murder (1) for remuneration or (2) the promise of remuneration or (3) employs another to commit the murder for remuneration or (4) employs another to commit the murder for the promise of remuneration." *Id.* at 736. Regardless of which manner is alleged, the State carries the heavy burden of demonstrating that the murder was performed for the reason of some sort of pecuniary gain. *Rice v. State,* 805 S.W.2d 432, 435 (Tex. Crim. App. 1991) ("The State is obligated to offer some evidence of the defendant's intent or state of mind as related to an expectation of [tangible] remuneration."); *see e.g.*, *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992) *superseded in part on other grounds, Herrin v. State,* 125 S.W.3d 436, 443 (Tex. Crim. App. 2002) (reversing because appellant's motive to kill for remuneration was "not proven to a high degree of certainty" where the State alleged appellant sought to insure his share in the gang's illicit activities or enhance his status by killing another gang member).

Further, a defendant may be held criminally responsible as a party to an offense, including capital murder, committed by another under certain enumerated circumstances. *See* Tex. Penal Code Ann. § 7.02. One such circumstance is when the defendant—acting with intent to promote or assist the commission of the offense—solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2). Under the law of parties, "direct evidence" of each element of the offense "is not required." *See Alcala v. State*, 476 S.W.3d 1, 17–18 (Tex. App.—Corpus Christi–Edinburg 2013, pet. ref'd) (quoting *Hooper*, 214 S.W.3d at 15). And the State may "enlarge an accused's criminal responsibility to include acts in which he may not be the principal actor." *Boston*

27

*v. State*, 373 S.W.3d 832, 837 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d 321 (Tex. Crim. App. 2013); *see Hughitt v. State*, 539 S.W.3d 531, 540 (Tex. App.—Eastland 2018), *aff'd*, 583 S.W.3d 623 (Tex. Crim. App. 2019) ("When the defendant is not the primary actor, the State must prove conduct constituting an offense plus an act by the defendant done with the intent to promote or assist such conduct.").

In other words, a hypothetically correct jury charge—where an appellant was charged as a party to capital murder under § 7.02(a)(2)[34]—required the State to prove that (1) Patterson, (2) acting with intent to promote or assist, (3) solicited, encouraged, directed, aided, or attempted to aid Mario to commit murder for remuneration. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1)–(2); 19.03(a)(3); 7.02(a)(2); *Beets*, 767 S.W.2d at 736–37.

The parties dispute whether the State was required to prove remuneration as applied to Mario, the principal actor committing the murder for remuneration, when both concede there was no evidence that Mario sought to receive remuneration. *See Rice*, 805 S.W.2d at 434 ("[T]he actor must expect to gain from some benefit assessed on the death of the victim."). Patterson points to the dissonance between the remuneration statute's literal text, the State's charge of Patterson as a party to the offense, and the

---

[34] Appellant was charged as follows:

Now, if you find from the evidence beyond a reasonable doubt that the Defendant, MONICA MELISSA PATTERSON, acting with Angel Mario Garza as a party to the offense, on or about the 28th day of January, 2015, in Hidalgo County, Texas, did then and there intentionally or knowingly cause the death of an individual, namely Martin Knell, by asphyxiating Martin Knell with an object unknown to the grand jurors, for remuneration or the promise of remuneration, namely, money, or the estate of Martin Knell, and that the Defendant, MONICA MELISSA PATTERSON, acting with intent to promote or assist the commission of the offense by Angel Mario Garza, solicited, encouraged, directed, aided, or attempted to aid Angel Mario Garza to commit the offense of capital murder for remuneration, then you will find the defendant, MONICA MELISSA PATTERSON, guilty of CAPITAL MURDER.

28

evidence presented. Patterson argues that for her to be found "criminally responsible for an offense committed by the conduct of another" under TEX. PENAL CODE ANN. § 7.02(a)(2), the State must independently prove the same offense has been committed by another, namely, that Mario committed murder for renumeration. *See Cary v. State*, 507 S.W.3d 750, 757–58 (Tex. Crim. App. 2016) ("To prove party liability, the State must show that the offense was committed *and* that the accused acted 'with intent to promote or assist commission of the offense' by soliciting, encouraging, directing, aiding, or attempting to aid the primary actor.") (emphasis added).

Having reviewed counsel's arguments and applicable case law, we observe that this case posits a unique issue.[35] However, contrary to Patterson's assertions that to properly invoke the law of parties the State must proffer evidence that a killer committed the same crime for which an accomplice has been charged, the Texas Court of Criminal Appeals has already opined that an "accomplice" and "killer" may harbor different states of mind, and as consequence, the accomplice may be guilty of a crime to a higher degree than the killer himself:

> To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; it may have been different from the state of mind of the principal and they thus may be guilty of different offenses. Thus, because first degree murder requires a deliberate and premeditated killing, an accomplice is not guilty of this degree of murder unless he acted with premeditation and deliberation. And, because a killing

---

[35] In *Bell v. State*, No. 03-00-00243-CR, 2001 WL 1510836, at *6 (Tex. App.—Austin Nov. 29, 2001, pet. ref'd), the court stopped short of addressing this very issue. The State in *Bell* presented evidence that appellant was hired to "kill a fireman for $1,000.00," and appellant killed the fireman with the assistance of another individual. *Id.* at *6. Appellant argued the evidence was legally insufficient to "(1) . . . show that 'he was the triggerman,' and (2) insufficient to show his guilt as a party 'because there was no evidence that the principal, Luis Ramirez, committed the murder for remuneration.'" The court of appeals, however, declined to address appellant's second argument, stating: "We do not understand appellant to challenge the remuneration issue. In this regard, appellant cites no authorities and there is no argument except that inherent in his assertion. This briefing fails to comply with Rule 38.1(h) of the Texas Rules of Appellate Procedure." *Id.* at *7; *see also Johnson v. State*, 208 S.W.3d 478, 496 (Tex. App.—Austin 2006, pet. ref'd) (assuming, but not deciding, that it was necessary for the State to prove at appellant's trial that the primary actor, who was not appellant, killed the victim for remuneration).

in a heat of passion is manslaughter and not murder, an accomplice who aids while in such a state is guilty only of manslaughter even though the killer is himself guilty of murder. *Likewise, it is equally possible that the killer is guilty only of manslaughter because of his heat of passion but that the accomplice, aiding in a state of cool blood, is guilty of murder.*

*Ex parte Thompson*, 179 S.W.3d 549, 554–55 (Tex. Crim. App. 2005).

Moreover, a review of *Beets*[36] and its progeny support a broad, "multi-faceted" interpretation of the statute, one which does not preclude consideration of Patterson's state of mind as a party to the offense. *Beets*, 767 S.W.2d at 736–37; *see Rice*, 805 S.W.2d at 434 (acknowledging that the Court has consistently adhered to broad construction of the remuneration statute); *see also Chambers*, 580 S.W.3d at 155 ("When interpreting a statute, we give effect to the plain meaning of the statute's language, unless the statute is ambiguous, or the plain meaning leads to absurd results."). An examination of the statute's legislative history also supports this encompassing interpretation.[37] *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

The purpose of the remuneration statute is to penalize those who "murder for gain or profit" at the highest level allotted under law. *See Beets*, 767 S.W.2d at 736; TEX. PENAL CODE ANN. §§ 12.13; 19.03(a)(3). It would therefore be absurd to allow a defendant to escape liability for capital murder where there is evidence that the defendant "would gain

---

[36] In *Beets*, the appellant shot and killed her husband, seeking "to profit by obtaining proceeds from life insurance or his pension benefits." *Beets*, 767 S.W.2d at 727. The court of criminal appeals affirmed on rehearing, reasoning that:

> [t]he [remuneration] statute is multi-faceted, by its very terms, including not only a killing performed for a principal by an agent, but also a murder by a principal with the expectation that he or she would gain from the benefits assessed on the death of the victim, or gain under the laws of probate or descent and distribution upon the death of the victim.

*Id.* at 736.

[37] The Legislature has repeatedly declined the opportunity to narrow the remuneration statute since its inception. We additionally note that the Legislature met and considered provisions within the capital murder statute most recently in 2019 and made no change to the provision at bar. *See* Tex. S.B. 719, 86th Leg., R.S. (2019).

from the benefits assessed on the death of the victim," *see Beets*, 767 S.W.2d at 736, simply because the defendant acted through another individual who sought to receive no such benefit. *See Chambers*, 580 S.W.3d at 155.

In finding the State's interpretation of the statute appropriate, we move to examine whether the evidence at trial was sufficient to support Patterson's conviction as a party to murder for remuneration. *See id.* at 156.

### a. Patterson's Motive

The jury was privy to evidence of Patterson's motive for wanting Martin dead: financial gain by bequeath—a form of remuneration. *Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt."); *see Beets*, 767 S.W.2d at 730–31 (providing that the remuneration statute encompasses killing "with the expectation that he or she would gain from the benefits assessed on the death of the victim, or gain under the laws of probate or descent and distribution upon the death of the victim"); *Johnson*, 208 S.W.3d at 496 (same).

Patterson first took a heightened interest in Martin after learning about his financial disposition from Grubb. In the span of one week, Patterson went from reporting Martin to local law enforcement authorities and APS, alleging threats of violence to Comfort and elder abuse or neglect, to accompanying Martin to his bank to inquire about withdrawing large sums of money. Within one month of meeting Patterson, Martin withdrew and transferred hundreds of thousands of dollars into her account. Within three months, Martin named Patterson the executrix of his estate and the principal agent of his medical and financial matters.

31

Testimony by Grubb, Martinez, and Mascorro indicated that while Patterson assumed near complete control of Martin's finances, Patterson also sought to alienate Martin from his only son. Moreover, testimony from Ybarra and Mascorro showed that Patterson's methods may have been without Martin's full accession or were pervious to Martin's fluctuating dispositions. According to Mascorro, Martin and Patterson engaged in a heated dispute on the morning of his death, which resulted in Martin demanding his keys to a filing cabinet—which jurors could presume held sensitive legal documents and in doing so, Martin was threating to make changes to the documents. *See Hooper*, 214 S.W.3d at 15 ("Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor.").

### b.    Mario's But-For Patterson Involvement

Mario was transported to Martin's residence by Patterson, indicated to Mascorro that he knew the reason for his presence, and only entered the residence—where he later killed Martin—at Patterson's instruction. *See Barrientos v. State*, 539 S.W.3d 482, 490 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Evidence is sufficient to convict under the law of parties "when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement."); *Miller v. State*, 83 S.W.3d 308, 318 (Tex. App.—Austin 2002, pet. ref'd) (holding evidence factually sufficient to sustain murder conviction as party to offense when circumstances showed that appellant drove the shooter, assisted the shooter in obtaining the murder weapon, and attempted to flee with the shooter).

### c.    Patterson's Confession

After witnessing Martin's murder, Patterson told Mascorro that she and Mario "had to put [Martin] to sleep because [Martin] was accusing [Mascorro] of stealing." *See Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015) ("When the burden of proof is 'beyond a reasonable doubt,' a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the corpus delicti." (quoting *Hacker v. State,* 389 S.W.3d 860, 865 (Tex. Crim. App. 2013))).

### d.    Patterson's Presence and Flight

Patterson's cell phone records and Patterson's recorded statements to Mascorro confirm Patterson and Mario were present during Martin's murder. *See Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) ("[C]ombined with other incriminating evidence, a defendant's presence [during a crime] may be sufficient to sustain a conviction."). Patterson then fled Martin's residence, rather than calling 9-1-1. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."); *Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *8 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (mem. op., not designated for publication) (providing that a defendant's failure to contact police indicates consciousness of guilt).

Moreover, Patterson lied about her presence, telling Ranger Callaway that she first arrived at Martin's home after receiving news of his death. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding that making false statements to cover up crime is evidence indicating consciousness of guilt and is admissible to prove commission of offense).

### e.    Patterson's Post-Murder Conduct

After Martin's murder, following failed attempts to instruct paramedics over the

phone to stop resuscitation efforts, Patterson returned to Martin's residence and presented paramedics with the DNR papers in-person.

Patterson also made false statements to APS, attempting to minimize the appearance of her involvement in Martin's personal affairs following his death. *See id.*; *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (holding that conduct after crime indicating defendant's consciousness of guilt is "one of the strongest kinds of evidence of guilt").

Meanwhile, Patterson's subordinates at work described Patterson behaving strangely. *See Torres*, 794 S.W.2d at 598. Patterson asked one employee about God and forgiveness. Meanwhile, Patterson asked another employee to drive her to a payphone so she could call Mario to caution him that the police were looking for him.

### f. Summary

Viewing the evidence in the light most favorable to the verdict and presuming the jury properly weighed the credibility of each witnesses' testimony, resolving any conflicts in favor of the State, *see Hooper*, 214 S.W.3d at 13, we conclude that the jury had sufficient evidence from which to conclude beyond a reasonable doubt that Patterson intentionally and knowingly solicited, encouraged, directed, aided, or attempted to aid Mario in the commission of Martin's murder for remuneration. *See Padilla*, 326 S.W.3d at 200; *Guevara*, 152 S.W.3d at 49. Patterson's first issue is overruled.

### B. Jury Charge Error

We next address Patterson's claims that the trial court erroneously "instructed on the law of parties" and failed to instruct the jury that Mascorro was an accomplice witness.

### 1. Standard of Review

The trial court must give the jury a written charge that sets forth the applicable law. *See Paredes v. State*, 129 S.W.3d 530, 538 (Tex. Crim. App. 2004). A trial court's failure to include an accomplice-witness instruction in a jury charge is reviewed under an abuse of discretion standard. *See id.* A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). When a party contends that the trial court erred in its charge to the jury, we must first determine whether the charge was erroneous and, if so, whether the error was harmful. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

### 2. Law of Parties

With respect to the law of parties, Patterson's argument is two-fold: (1) the jury charge improperly authorized for her conviction as the primary actor; and (2) the charge did not appropriately instruct the jury to also find that Mario was guilty of capital murder.

We disagree with Patterson's characterization of the jury charge, which in its application paragraph, clearly dictates that the jury return a guilty verdict only if it finds evidence beyond a reasonable doubt that Patterson:

> acting with [Garza] *as a party to the offense*, . . . did then and there intentionally or knowingly cause the death of an individual, namely Martin Knell, . . . and that the Defendant, [Patterson], *acting with intent to promote or assist the commission of the offense by* [Garza], *solicited, encouraged, directed, aided, or attempted to aid* [Garza] *to commit the offense of capital murder for remuneration* . . . .

The language includes a verbatim rendering of the law of parties statute, as indicated in italics above. *See Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) ("[I]f the application paragraph 'necessarily and unambiguously' refers to another

35

paragraph of the jury charge, then a conviction is authorized, and the trial judge need not *sua sponte* 'cut and paste' that definition into the application paragraph."); *Chatman v. State*, 846 S.W.2d 329, 330 (Tex. Crim. App. 1993) (holding that an application paragraph which incorporated the law of parties by stating only that the "either acting alone or as a party, as that term has been defined" sufficiently applied the law of parties).

Therefore, the charge properly instructed the jury to find Patterson guilty of the offense only as a party—not, as she asserts, only as a principal. Finding no error, our charge analysis ends.[38] *See Herron*, 86 S.W.3d at 632. We overrule Patterson's second issue. We turn to address Patterson's disputes regarding an accomplice-witness charge instruction.

### 3. Accomplice-Witness Testimony

Patterson contends the trial court erred in failing to instruct the jury that Mascorro was an accomplice witness, and Mascorro's testimony, as an accomplice witness, required corroboration. Without such corroboration, Patterson argues her conviction cannot stand. *See* TEX. CODE CRIM. PRO. ANN. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed.").

#### a. Applicable Law

A witness can be an accomplice as a matter of fact or as a matter of law. *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017). A witness is an accomplice as a matter of law if the witness has been charged with the same offense as the defendant or

---

[38] We need not address Patterson's second sub-point, having already found that the State was not required to prove that Mario committed murder to the degree as charged to Patterson. *See* TEX. R. APP. P. 47.4.

36

a lesser-included offense or "if there is 'no doubt or the evidence clearly shows' that the witness is an accomplice." *Id.* (quoting *Paredes*, 129 S.W.3d at 536). The trial court need not give the jury an accomplice-witness instruction when the evidence is clear that the witness is neither an accomplice as a matter of law nor as a matter of fact. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006).

One who participates with the defendant before, during, or after the commission of the crime and acts with the required culpable mental state for the crime is an accomplice. *See Ash*, 533 S.W.3d at 884. "Mere presence at a crime scene does not make an individual an accomplice, nor is an individual an accomplice merely because she has knowledge about a crime and fails to disclose that knowledge." *Cocke*, 201 S.W.3d at 748*; Easter v. State*, 536 S.W.2d 223, 225 (Tex. Crim. App. 1976) ("One is not an accomplice simply 'because he or she knew of the crime but failed to disclose it or even concealed it.'").

However, where a person has a legal duty to prevent commission of the offense but fails to make a reasonable effort to do so, responsibility as a party attaches if the evidence shows that the person acted with intent to promote or assist in the commission of the offense—irrespective of whether the participation was by omission. *See* Tex. Penal Code Ann. § 6.01(c) (an omission or failure to perform an act is not an offense unless there is a legal duty to act); *Carson v. State*, 422 S.W.3d 733, 742 (Tex. App.—Texarkana 2013, pet. ref'd). Legal duty, however, is not defined under the statute and has generally been limited to guardianship relationships. *See Guevara v. State*, 152 S.W.3d 45, 52 n.2 6 (Tex. Crim. App. 2004) (analyzing legal duty examples and providing that save for limited exceptions, "generally a spouse does not have a legal duty to prevent harm to the other spouse"); *see also Dawkins v. State*, 557 S.W.3d 592, 604 (Tex. App.—El Paso

2016, no pet.) (finding legal duty where appellant was "acting *in loco parentis*," as evidenced by appellant's power of attorney over a child); *Olivarez v. State*, No. 13-18-00374-CR, 2019 WL 4866039, at *4 (Tex. App.—Corpus Christi–Edinburg Oct. 3, 2019, no pet. h.) (mem. op., not designated for publication) (finding mother of abused child had a legal duty to protect said child from a known sexual abuser in the home).

### b. Analysis

Patterson reasons Mascorro is an accomplice as a matter of law because she had a legal duty to protect Martin under penal code §§ 22.04 and 7.02(a)(3). TEX. PENAL CODE ANN. § 22.04 ("A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual."); § 7.02(a)(3) (concerned with situations in which a person may be criminally responsible for the conduct of another by failing to act); *but see Medrano v. State*, 612 S.W.2d 576, 578 (Tex. Crim. App. 1981) (providing that without a legal duty arising to prevent the commission of an offense, there is no criminal conduct).

Patterson affords no authority[39] for utilizing a definition embedded in § 22.04[40] to expand legal duty to encompass Mascorro, and we find none. Where courts have previously limited this legal duty to parent-child relationships and legal guardianship

---

[39] Patterson cites a number of cases discussing legal duty, all under the limited context of a parent-child relationship. *See Carson*, 422 S.W.3d at 742 (finding legal duty where appellant, mother of the "victimized child" was present during a thirty-hour exorcism of her child, wherein she "saw and heard the great pain and distress of the child . . . but took no action to prevent the commission of her murder."); *Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *8 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (mem. op., not designated for publication) (finding appellant mother had a legal duty to protect her three-year-old daughter from fatal physical abuse by mother's boyfriend).

[40] Under § 22.04(b)(1)–(2), "[a]n omission that causes a condition described by [this statute] is conduct constituting an offense under this section if: (1) the actor has a legal or statutory duty to act; *or* (2) the actor has *assumed care, custody, or control* of a child, elderly individual, or disabled individual." TEX. PENAL CODE ANN. § 22.04 (emphasis added).

relationships, we decline to expand the parameters to include a weekday housekeeper under these facts. Assuming without deciding that such title—whether housekeeper or caregiver—carries heightened responsibilities, the evidence here does not support a finding that Mascorro "assumed care, custody, or control" of Martin as she did not provide his housing, administer his medical care, or insure his protection in another manner. *See Hicks v. State*, 241 S.W.3d 543, 545 (Tex. Crim. App. 2007) ("The actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care."); *see also Billingslea v. State*, 780 S.W.2d 271, 274–75 (Tex. Crim. App. 1989) ("[A] niece's failure to feed her invalid aunt, who starves to death as a result, is not guilty of criminal homicide because the niece has no statutory duty of support.").

Absent a legal duty, Mascorro's failure to stop the commission of the crime or intervene by some means does not render her an accomplice because such inaction does not constitute an affirmative act. *See Cocke*, 201 S.W.3d at 748; *Billingslea*, 780 S.W.2d at 274–75 (providing that if the offense itself does not penalize an omission, "there must be a violation of some duty [to perform the omitted act] imposed by law, directly or impliedly, and with which duty the defendant is especially charged . . . Contractual duties, or those arising from a special relationship, or fact situation, are thus excluded and will not support the imposition of criminal responsibility."); *see, e.g., Lane v. State*, 991 S.W.2d 904, 907 (Tex. App.—Fort Worth 1999, pet. ref'd) (witness who was present "during the entire series of events" and "knew full well what the other three actors were doing," but did not stop crime or alert anyone "committed no affirmative act in furtherance of the crime," because she omitted to act).

39

Therefore, the trial court did not err in failing to instruct the jury on the accomplice witness rule as applied to Mascarro, and accomplice testimony precedent necessitating corroboration does not apply here. *See Ash*, 533 S.W.3d at 884; *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016). Patterson's alternative arguments are premised on a legal duty imposed on Mascarro. Having found no such legal duty, we need not review further. *See* TEX. R. APP. P. 47.4. Patterson's third issue is overruled.

## C.      Expert Witness Testimony

Patterson next contends the trial court erred in its admittance of Farley's testimony as an expert witness.

### 1.      Standard of Review and Applicable Law

We review a trial court's decision on the admission of expert testimony for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "[A] trial court abuses its discretion when it acts without reference to any guiding rules or principles or acts arbitrarily or unreasonably." *Id.* We will uphold the trial court's ruling on the admission of evidence unless it lies outside the zone of reasonable disagreement. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009).

A witness who qualifies as an expert by knowledge, skill, experience, training, or education may testify if the witness's scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact issue. TEX. R. EVID. 702. The proponent of the testimony must establish by clear and convincing proof that the proffered testimony is sufficiently relevant and reliable. *Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006).

To assess the reliability of an expert's opinion based on a hard science, a reviewing court applies the three-prong *Kelly* test, requiring that "(1) the underlying scientific theory

be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question." *Rhomer*, 569 S.W.3d at 671 (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)); *Weatherred v. State*, 15 S.W.3d 540, 542 n. 5 (Tex. Crim. App. 2000). When expert testimony concerns a field of study outside the hard sciences, such as forensic pathology, we apply the *Nenno* test to evaluate the reliability of an expert's testimony. *Rhomer*, 569 S.W.3d at 671 (citing *Nenno v. State*, 970 S.W.2d 549, 550 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999)); *see also Bess v. State*, No. AP-76377, 2013 WL 827479, at *26 (Tex. Crim. App. Mar. 6, 2013) (mem. op., not designated for publication) ("[U]nlike hard sciences, the field of pathology (and forensic pathology), though based on ascertainable medical principles, cannot always produce discrete verifiable conclusions. Because a pathologist must interpret data and frequently cannot reach essential conclusions with mathematical precision, we hold that the admissibility standard from *Nenno* may apply to the expert testimony of a pathologist.") The *Nenno* test asks whether "(1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Rhomer*, 569 S.W.3d at 671. Reliability, under either the *Kelly* or *Nenno* test, should be evaluated by referencing the standards applicable to the particular professional field in question. *Coble v. State*, 330 S.W.3d 253, 274 (Tex. Crim. App. 2010).

### 2. Analysis

Patterson specifically contends Farley's opinion is inadmissible under the Texas Rules of Evidence because: (1) Farley failed to rule out other potential causes of death; (2) Farley impermissibly relied upon information that others had provided to her; (3) an

analytical gap exists between Farley's medical data and conclusions; and (4) Farley failed to properly apply her own non-scientific methodology. We disagree.

Farley identified herself as an experienced forensic pathologist and explained that as a forensic pathologist, she must "look at any information that's available on the circumstances surrounding the death"—which invariably includes medical records and investigative information, if any. In accordance with those standards, Farley testified that she considered several of Martin's preexisting conditions and opined why each would not have produced his death. "[Martin] didn't have what I could see as an acute heart attack. And I did microscopics—looking at the tissue itself . . . . But I didn't see any indications in his heart of an acute myocardial infarction." When pushed whether Martin's enlarged heart could have nevertheless contributed to his death, Farley maintained a distinction between cause of death and a decedent's medical predispositions: "[An individual] can be shot in the chest, and still have a large heart." According to Farley, the absence of exterior and interior anatomical trauma observed during her autopsy of Martin rendered it critical that she review law enforcement investigation documentation, which included statements indicating death by smothering. Farley testified that the lack of physical evidence for a death by suffocation case was not unusual if the decedent was smothered by a soft object or was frail—as Martin was. Having reviewed the entirety of Dr. Farley's testimony, we find no analytical gap[41] between her findings and the conclusion drawn,

---

[41] We note that the "analytical gap" test is one exclusively utilized in civil suits, with sister courts using the phrase only in name. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 717 (Tex. 2016) ("If there is too great an analytical gap between the data relied on and the expert's opinion, the expert's testimony is unreliable."); *but see State v. Dominguez*, 425 S.W.3d 411, 422 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *Yepez v. State*, No. 04-17-00358-CR, 2019 WL 2784448, at *3 (Tex. App.—San Antonio July 3, 2019, no pet.) (mem. op., not designated for publication).

nor do we see a departure from application of her stated methodology. *Rhomer*, 569 S.W.3d at 671; *Layton*, 280 S.W.3d at 240.

With respect to Patterson's "rule out" argument—as Patterson herself acknowledges—while civil law provides for a "rule out" requirement, our criminal law precedence carries no such requirement. Patterson provides no authority[42] for an argument which necessarily assumes that a medical examiner is required to base her cause and manner of death determinations exclusively on an autopsy. *See* TEX. CODE CRIM. PROC. ANN. art. 49.25, § 6(a)(4); *see also Chakravarthy v. State*, 516 S.W.3d 116, 131–32 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (providing Dr. Farley's testimony sufficient where, she "testified she reviewed the police investigation reports, as well as the medical records as part of her analysis when conducting the autopsy"). The criminal code does not restrict the scope of a medical examiner's investigation to an autopsy, instead expressly contemplating that a medical examiner may conduct an inquest without performing an autopsy in some cases. *See* TEX. CODE CRIM. PROC. ANN. art. 49.25; *see also Stansberry v. State*, No. 02-17-00150-CR, 2018 WL 6565780, at *12 (Tex. App.—Fort Worth Dec. 13, 2018), cert. denied, 140 S. Ct. 295 (2019) (mem. op., not designated for publication). We therefore conclude the trial court did not err in its admission of Farley's expert testimony. *Rhomer*, 569 S.W.3d at 671; *Layton*, 280 S.W.3d at 240. We overrule Patterson's fourth issue.

---

[42] Patterson cites to *Ex Parte Robbins*, 478 S.W.3d 678, 691–92 (Tex. Crim. App. 2014), which we find to be distinguishable in applied purpose and fact. In *Ex Parte Robbins*, the court granted habeas relief after the original medical examiner revised her expert opinion to declare the cause of death "undetermined." *Id.* at 692. Where the applicant was convicted solely on medical examiner testimony, the court reasoned "had [the medical examiner's undetermined finding] been presented at trial, the applicant would not have been convicted." *Id.* We disagree that the court's analysis in *Ex Parte Robbins* creates a "rule out" requirement. *See id.* Even so, this case presents factually different circumstances as the State's evidence, if believed, included testimony from a witness to Martin's murder.

**D.    Video and Phone Call Recording Evidence**

Patterson further asserts that the trial court improperly admitted the phone call and Whataburger recordings because the State did not meet "the adoptive admission requirement" under the rules of evidence. *See* TEX. R. EVID. 801(e)(2)(B).

**1.    Standard of Review and Applicable Law**

We review a trial court's ruling on the admission of evidence under an abuse-of-discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). We uphold the trial court's ruling unless it is outside the zone of reasonable disagreement. *Id.; Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016).

An analysis of evidence at issue here necessitates a review of hearsay principles. Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *Dinkins v. State*, 894 S.W.3d 330, 347 (Tex. Crim. App. 1995) (providing that extrajudicial statements do not constitute hearsay if offered to show what was said, rather than for the truth of the matter stated). Hearsay is inadmissible except as provided by statute, the rules of evidence, or other rules prescribed under statutory authority. TEX. R. EVID. 802. One such evidentiary rule dictates "plainly and unequivocally" that a "defendant's own statements, when being offered against him, are not hearsay." *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999). Defendant statements "are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements." *Id.* at 853; *e.g. Alcala v. State*, 476 S.W.3d 1, 23 (Tex. App.—Corpus Christi–Edinburg 2013, pet ref'd).

Meanwhile, statements made by others in a defendant's presence may be admissible as nonhearsay adoptive admissions if the defendant "by his actions and

44

responses, showed agreement with the statements." *Paredes*, 129 S.W.3d at 534; *see also* TEX. R. EVID. 801(e)(2)(B) (providing that a statement offered against a party which is "a statement of which the party has manifested an adoption or belief in its truth" is also excluded from a hearsay determination). The State has the burden to prove by a preponderance that the testimony proffered qualifies as an adoptive admission. *Alvarado v. State*, 912 S.W.2d 199, 215 (Tex. Crim. App. 1995). It is on this basis that Patterson contends the State fell short.

### 2. Analysis

The State counters that Mascorro's statements—heard in the recordings alongside Patterson's—were not offered for the truth of the matter asserted, and therefore, do not implicate the adoptive admission rule. Accordingly, the State argues that we need not reach the question of which, if any, exceptions to the hearsay rule might apply as no hearsay testimony was admitted. We agree.

The adoptive admission rule is not implicated here. *See Cantu v. State,* 939 S.W.2d 627, 634–35 (Tex. Crim. App. 1997). The State tendered the recorded exhibits for the purpose of presenting Patterson's prior statements; Mascorro's statements, also heard in the audio recordings, were incidental and included as a matter of contextual convenience. *See Kirk v. State*, 199 S.W.3d 467, 479 (Tex. App.—Fort Worth 2006, pet. ref'd) (providing that an out-of-court statement offered to give context to defendant's replies during an interview was not hearsay, and redaction of statements would have rendered the interview incoherent); *see also Hernandez v. State*, No. 01-08-00306-CR, 2009 WL 1331649, at *7 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref'd) (mem. op., not designated for publication) (same).

Moreover, the trial court provided the jury with an explicit verbal instruction that it was not to consider Mascorro's statements beyond context because they were not being offered or admitted for the truth of the matter asserted; a written instruction was also included in the jury's charge. We presume the jury followed the trial court's instruction in the absence of evidence to the contrary. *See Reeves v. State*, 420 S.W.3d 812, 818 (Tex. Crim. App. 2013). With Mascorro's statements deemed not hearsay, *see* TEX. R. EVID. 801(d), we are left with Patterson's out-of-court statements, which were admissible. *See* TEX. R. EVID. 801(e)(2). Therefore, the trial court acted within the zone of reasonable disagreement in admitting the exhibits. We overrule issues five and six.

### III. COUNT TWO: AGGREGATE THEFT

Patterson next argues the judgment was unsupported by legally sufficient evidence because the State failed to produce evidence of (1) the minimum threshold for aggregate theft as charged, (2) deception, and (3) Comfort's non-profit status.

### A. Standard of Review and Applicable Law

We utilize the same standard of review set forth above for a sufficiency of the evidence analysis. *See Chambers*, 580 S.W.3d at 155–56. A person commits the offense of theft if that person unlawfully appropriates property with the intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03(a). As charged in this case, theft is a first-degree felony if the State proves the property unlawfully appropriated was valued at $100,000 or more and the owner of the property appropriated was a non-profit organization. *Id.* § 31.03(a), (e)(6)(A), (f)(3)(C).

Appropriation is unlawful if it is without the owner's effective consent. *Id.* § 31.03; *see id.* § 31.01 ("'Effective consent' includes consent by a person legally authorized to act for the owner."). Here, theft was charged two ways: (1) traditionally, without effective

46

consent, and (2) by deception. *See id.* § 31.01; *see also Fernandez v. State*, 479 S.W.3d 835, 838 (Tex. Crim. App. 2016) (providing that evidence of "the deception must precede the consent given").

Deception is defined as, among other things, "(1) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true or (2) preventing another from acquiring information likely to affect his judgment in the transaction." *Demond v. State*, 452 S.W.3d 435, 454 (Tex. App.—Austin 2014, pet. ref'd) (citing TEX. PENAL CODE ANN. § 31.01(1)(A), (C)). It can also mean promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed. *See* TEX. PENAL CODE ANN. § 31.01(1)(E); *see also Daugherty v. State*, 387 S.W.3d 654, 659 n.18 (Tex. Crim. App. 2013) ("The reliance need not be the sole, or even controlling, reason why the victim decided to provide [his consent], but it must be a substantial or material factor in the decision-making process.").

B.  **Analysis of Value**

The State provided evidence of unauthorized expenditures contained in exhibits admitted at trial through two witnesses: Guevara and De Witt. The informal audit conducted by Guevara totaled unauthorized expenditures at $86,596.36. Guevara, however, conceded to the presence of a "typo," a charge from Chick-fil-A in the amount of $19,365.15, thereby reducing the total amount to $67,231.21. Guevara divided expenses into the following categories: debit card totals for 2014 and 2015, "ATM Withdrawals," "Petty Cash Checks," "Codie's Party," and "Questionable Checks." De Witt,

47

incorporating many of the same categories and individual expenses,[43] reached a separate total of $68,944.10 unauthorized expenditures. The State avers that consideration of either of these totals, coupled with the Falcon account expenditures of $36,464.76, amount to over $100,000 in unauthorized expenditures. Specifically, Guevara's total equals to $103,695.97. De Witt's total equals to $105,408.86. Though further review indicates multiple errors, none of which when aggregated would reduce the total amount to less than $100,000, the minimum amount statutorily required for the charged offense.[44] *See* TEX. PENAL CODE ANN. § 31.03.

Patterson alternatively argues that consideration of any of the alleged amounts is improper because, unlike Gonzalez,[45] neither De Witt nor Guevara independently confirmed that each itemized expense was unauthorized. *See Hooper*, 214 S.W.3d at 15 ("[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions."); *but see Kent v. State*, 483 S.W.3d 557, 562 (Tex. Crim. App. 2016) ("Every instance of theft need not be unanimously agreed upon by the jury.").

Guevara testified he individually reviewed items listed in Comfort's bank records and corresponding receipts. Based on his on his knowledge as Comfort's president and through "speaking to [Comfort] staff," he determined whether the expenses were

---

[43] DeWitt divided the expenses that she examined into eleven categories: "Overdraft," $1,216.00; "ATM Withdrawal," $3,060.00; "Travel," $9,311.93; "Shopping," $10,061.11; "Pharmacy," $1,167.71; "Gas," $3,366.57; "Codie's Party," $20,161.72; "Questionable Checks," $2,720.29; "Restaurants," $3,920.91; "AT[&]T," $8,300.40; and "Petty Cash," $5,657.46.

[44] Patterson argues that De Witt's errors exceed $5,021.93 but provides us with no specifications. Our calculations reveal errors amounting to $3,678.08. In any manner, consideration of the errors, even as alleged by Patterson, result in a calculation exceeding the statutory minimum.

[45] Gonzalez confirmed the legitimacy of expenses reviewed in her audit by speaking with Patterson.

reasonable and necessary.[46] Guevara resolved that some expenditures were reasonable, and he kept chronological order of all those that were not. Guevara later "placed [sic] in front of [the Comfort board]—showing them what we had found, the receipts."[47]

Guevara was not a board member for the 2014 fiscal year and nonetheless made legitimacy determinations on expenditures incurred in 2014. However, the jury was also privy to other evidence of Patterson's limitations as acting administrator for Comfort. Patterson (1) was aware that she was not permitted to use Comfort funds for personal use, (2) had a car allowance and did not have authority to travel "outside the Valley" on Comfort accounts, (3) had "no need to withdraw cash", and (4) was never given a dining allowance. Board members additionally testified that Patterson did not have explicit permission to use Comfort funds for her son's graduation party, which Patterson paid for with Comfort debit cards. Multiple vendors contracted by Patterson for the party testified to amounts, which in aggregate exceeded $20,000. Copies of receipts accompanied much of the testimony at trial. The State also presented evidence of an unapproved of Falcon account resulting in $36,464.76 of unauthorized charges. *See Kent*, 483 S.W.3d at 562 ("As long as the jury unanimously agrees that the proven thefts that comprise the elements of aggravated-theft exceed the threshold amount and the thefts are proven beyond a reasonable doubt, regardless of which transactions each juror believes to have occurred, the aggregated-theft is proved.").

---

[46] Guevara testified, "[I went] through these receipts—We started to request statements from the bank, looking through what was due, speaking to the staff there—there was two people on staff at that time—what bills were outstanding—going through that."

[47] On cross-examination, Guevara wavered as to whether he showed board members the receipts he had collected.

Though the record contains conflicting evidence, including evidence of expenditures considered in the aggregate that Patterson was permitted to make, we presume that the trier of fact resolved any such conflicts in favor of the prosecution, and we defer to that resolution. *Padilla*, 326 S.W.3d at 200.

**C.     Analysis of Deception**

Patterson also asserts that the State failed to provide evidence of deception. It is uncontested that Patterson had board consent to spend Comfort funds, but the extent of her autonomy was controverted.

Board members testified that Patterson's ability to use Comfort monies was limited to Comfort management purposes. Moreover, the State's witness testimony indicated that Patterson (1) was given very little oversight in her position, which the State alleges she knew and abused; (2) created the false impression that she was properly managing Comfort's funds via verbal assurances during the board's monthly meetings; and (3) prevented the board from accessing information that would have otherwise affected their perception of her management by refusing to provide any financial documentation during her tenure, despite repeated requests to do so. *See* TEX. PENAL CODE ANN. § 31.01(1)(A), (C).

Patterson countered that because she used Comfort's accounts openly, leaving receipts in her office and extensively documenting her expenses, such behavior "affirmatively disapprove[s] this allegation" of deception. Regardless, the jury was privy to all of the aforementioned evidence, including Patterson's associated arguments, and resolved the matter in favor of the State. *See Padilla*, 326 S.W.3d at 200. Based on this evidence, the jury could have reasonably construed that Patterson used a false pretext to maintain control of Comfort finances and induced her employers into permitting her

50

continued access to Comfort monies through deception. *See id.*; *Braughton*, 569 S.W.3d at 608; *Merryman v. State*, 391 S.W.3d 261, 272 (Tex. App.—San Antonio 2012, pet. ref'd).

**D. Analysis of Non-Profit Designation**

To Patterson's last sub-point that the State failed to provide evidence of Comfort's non-profit designation, we note that both parties referred to Comfort as a non-profit throughout trial, and the State proffered evidence in the form of testimony by Comfort board members and employees, along with exhibits of Comfort's non-profit designation through the IRS. Although the admitted IRS documents predated Patterson's hiring at Comfort, there was also evidence that Patterson claimed Comfort's non-profit status, utilizing Comfort's same IRS number, to open a bank account on behalf of Comfort.

The jury was permitted to make the necessary inferences based upon the combined and cumulative force of all the evidence and did so. *Hooper*, 214 S.W.3d at 13*; see Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Edwards v. State*, No. 09-15-00249-CR, 2016 WL 3564410, at *3 (Tex. App.—Beaumont June 29, 2016, pet. ref'd) (mem. op., not designated for publication) (holding that a pastor's testimony that a church was a nonprofit, although the Church's application to be designated as a nonprofit organization under 501(c)(3) was done before he became Pastor, was sufficient evidence of "nonprofit" designation in a theft from a nonprofit case).

Viewing the evidence in the light most favorable to the verdict, we find the evidence legally sufficient to support Patterson's conviction for aggregate theft in the amount of $100,000 or more. *See* TEX. PENAL CODE ANN. § 31.03(a); *Braughton*, 569 S.W.3d at 608. We overrule issue seven.

## IV. COUNT THREE: MISAPPLICATION OF FIDUCIARY PROPERTY

Patterson next complains she was subjected to duplicative criminal punishments.[48]

## A. Standard of Review and Applicable Law

Claims of double jeopardy arise when duplicative prosecutions or punishments involve the same offense. *Loving v. State*, 401 S.W.3d 642, 646 (Tex. Crim. App. 2013). Where the "charged conduct involves multiple offenses in different statutory provisions that are the result of a single course of conduct," we employ the *Blockburger* test. *See id.*; *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Under the *Blockburger* test, if the two offenses have different elements, the judicial presumption is that the offenses are different for double-jeopardy purposes and that cumulative punishment may be imposed. *Ex parte Benson*, 459 S.W.3d 67, 72–73 (Tex. Crim. App. 2015). This presumption can be rebutted by a showing, through various factors, that the legislature "clearly intended only one" punishment. *Loving*, 401 S.W.3d at 646 n. 2; *Ex parte Ervin v. State,* 991 S.W.2d 804, 807 (Tex. Crim. App. 1999) (holding that because the ultimate question is legislative intent, "the *Blockburger* test cannot authorize two punishments where the [L]egislature clearly intended only one").

Neither party disputes that an analysis of these two statutes would pass the *Blockburger* test. Therefore, we must apply a modified version of the cognate-pleadings approach to determine if the two statutes should be treated the same. *See Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). Relevant factors in making this determination include:

(1) whether the offenses are contained within the same statutory section;

(2) whether the offenses are phrased in the alternative;

---

[48] Patterson does not argue the legal sufficiency of the evidence with respect to count three.

(3) whether the offenses are named similarly;

(4) whether the offenses have common punishment ranges;

(5) whether the offenses have a common focus (that is, whether the gravamen of the offenses is the same) and whether that common focus tends to indicate a single instance of conduct;

(6) whether the elements that differ between the offenses can be considered the same under an imputed theory of liability (that is, a liberalized Blockburger standard utilizing imputed elements); and

(7) whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double-jeopardy purposes.

*Ex parte Ervin*, 991 S.W.2d at 814.

## B.    Analysis

We first observe that the statutes at issue here are contained in separate statutory sections: aggregate theft is located under Chapter 31 "Theft," and misapplication of fiduciary property under Chapter 32 "Fraud," subchapter "Other Deceptive Practices". TEX. PENAL CODE ANN. §§ 31.03(a), § 32.45. Though the statutes carry common punishment ranges, the statutes are neither phrased in the alternative nor named similarly. *See Ex parte Ervin*, 991 S.W.2d at 814.

The statutes also differ in their respective required elements of proof. *See* TEX. PENAL CODE ANN. §§ 31.03(a); § 32.45. Theft under § 31.03(a) requires evidence that the defendant (1) unlawfully (2) appropriated property (3) with the intent to deprive the owner of it. Misapplication under § 32.45 requires evidence that the defendant (1) intentionally, knowingly, or recklessly (2) misapplied property (3) that it held as a fiduciary, (4) in a

manner that involves substantial risk of loss to the owner of the property.[49] *See id.*; *see generally Rhinehardt v. State*, No. 08-01-00335-CR, 2003 WL 21674198, at \*9–10 (Tex. App.—El Paso July 17, 2003, no pet.) (mem. op., not designated for publication) (concluding that defendant failed to show that the legislature intended for theft and misapplication of fiduciary property offenses to be treated as same for double-jeopardy purposes).

Perhaps the largest distinguishing factor between the two statutes is that the fiduciary statute is aimed at a specific class of persons: one who holds a fiduciary duty. *See* TEX. PENAL CODE ANN. §§ 31.03(a); §32.45. "Any person may commit theft," but "[o]nly one in a position of trust may commit misapplication of fiduciary property." *Talamantez v. State*, 790 S.W.2d 33, 37 (Tex. App.—San Antonio 1990, pet. ref'd); *see also Berry v. State*, 424 S.W.3d 579, 586 (Tex. Crim. App. 2014) (affirming appellant's theft conviction while reversing appellant's conviction of misapplication of fiduciary property because appellant's relationship with the complainant did not rise to one with a fiduciary duty).

In applying the remainder of the *Ervin* factors and reviewing our legal precedence, including legislative history, we conclude that the offenses as charged are not the same for purposes of a double jeopardy claim. *See Miller v. State*, 92 Tex. Crim. 259, 260, 242 S.W. 1040, 1043–44 (1922) ("Concerning the cases of theft and swindling to which appellant refers, both the statute and principle controlling its interpretation seem to us to

---

[49] The Texas Penal Code provides definitions for "fiduciary," "misapply," and "owner" relevant to this offense. "Fiduciary" is defined as including a "manager" or an "employee." TEX. PENAL CODE ANN. § 32.45(a)(1)(D). "Misapply" means "to deal with property contrary to an agreement under which the fiduciary holds the property." *Id.* § 32.45(a)(2)(A). "Owner" means a person who has title to the property, possession of the property (whether lawful or not), or a greater right to possession of the property than the actor. *Id.* § 1.07(a)(35).

suggest a distinction. In theft generally the possession is interfered with without the consent of the rightful possessor. In embezzlement . . . [h]is possession is rightful. It is his misuse of the property that is criminal."). Accordingly, we find that no double jeopardy violation has occurred, and Patterson's eighth issue is overruled.

## V.     COUNT FOUR: ATTEMPTED THEFT

Patterson last argues that there was insufficient evidence to uphold her conviction of attempted theft.

### A.     Standard of Review and Applicable Law

Having already outlined the standard of review for sufficiency claims and applicable law for theft, a person commits the criminal offense of attempt if, with specific intent to commit an offense, she does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended. *See* TEX. PENAL CODE ANN. § 15.01(a). Though an attempted theft allegation requires a showing of intent to steal, this intent may be inferred from circumstantial evidence. *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996).

### B.     Analysis

Patterson was charged here with attempted theft of property valued at $200,000 or more. The indictment charged as follows:

> [Patterson] with the specific intent to commit the offense of theft of property of an aggregate value of $200,000 or more, commits acts which amounted to more than mere preparation that tended, but failed to effect the commission of the offense intended, with intent to deprive [Mark], or any other person having greater right to possession of property other than the Defendant upon the death of [Martin], did cause [Martin] on or about the 22nd day of December, 2014 to execute a will naming [Patterson], the defendant, as a beneficiary to receive said property upon the death of [Martin], or on or about the 5th day of January A.D., 2015 did cause [Martin] to name the [Patterson], the defendant, as the payee on death of a bank account of [Martin], or on or about the 16th day of February A.D. 2015,

55

[Patterson], the defendant, did file the will executed by [Martin] on or about the 22nd day of December, A.D. 2014, for probate . . . .

Patterson argues specifically that (1) there was no evidence Mark had sufficient ownership interest in the property or that Patterson caused Martin to change his dispositions, and (2) this will contest is a civil matter masquerading as an attempted theft charge.

For purposes of proving ownership, while we agree with the premise that an anticipated, but not yet effectuated, beneficiary status does not equate to present property ownership, the charge included a proficient caveat: "with intent to deprive [Mark], *or any other person* having greater right to possession of property other than the Defendant." In other words, the language of the charge stipulates that the proof would turn on whether Patterson held the requisite criminal intent to deprive whoever would otherwise have taken Martin's property after his death. *See generally Chambers*, 580 S.W.3d at 155.

One sister court has examined whether this catch-all language is permissible and sufficient, answering in the affirmative. *See McCay v. State*, 476 S.W.3d 640, 645 (Tex. App.—Dallas 2015, pet. ref'd). Although Patterson urges us to resolve otherwise, we find *McCay* instructive. *See id.* The court reasoned that the theft statute has historically maintained a "broad reach," which already encompasses theft by legal documents. *See id.* (citing *Lehr v. State,* No. 05–09–00381–CR, 2011 WL 1566970, at *8 (Tex. App.—Dallas Apr. 27, 2011, pet. ref'd) (mem. op., not designated for publication) (theft by deed); *see also Cooper v. State,* 707 S.W.2d 686, 691–92 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (theft by promissory note)). Moreover, the criminalization of will contests, to the extent this could be construed as one, is limited wherein a "will proponent knowingly

56

submits a will for probate with the specific intention of stealing an estate from others with the legal right to inherit." *Id.*

Patterson maintains there was "no evidence . . . that Patterson caused Martin to change his will or bank account to cut Mark out." We disagree. Several State's witnesses testified that Patterson (1) upon finding out about Martin's fortune, expressed a significant interest in accessing and controlling Martin's finances, who at all relevant times remained merely the spouse of a patient (or former patient) at her facility; (2) quickly befriended Martin, who several witnesses depicted as friendly and jurors could infer as lonely; (3) removed Martin's son from Penny's primary point of contact after he attempted to transfer Penny out of Comfort's care and accompanied Martin to his bank to withdraw his money within the same week; (4) within two months of knowing Martin, convinced him to withdraw an excess of $300,000 for her to hold for him, and bank employees testified that he had never made such large withdrawals; (5) although unprompted, repeatedly attempted to diffuse any concerns of elder exploitation to an extent which roused suspicions of multiple testifying witnesses; (6) made changes to Martin's stockholder account without his authorization; (7) orchestrated Martin's will change and other legal documents, designating herself as the primary agent for all his affairs; (8) denied her involvement in Martin's financial matters after his death, though she had already probated his will; (9) declined to provide Martin's son with an unredacted will and refused to allow Mark into the home, though she knew he was the intended beneficiary of the residence; (10) misrepresented or lied to Martin regarding his son's intentions with Martin's finances and other affairs, purposefully fueling hostility between Martin and his son, and (11) was a party to Martin's murder.

Having viewed the evidence in the light most favorable to the verdict, we conclude that, this evidence is sufficient to show Patterson intentionally attempted to deprive Martin's rightful heirs from an inheritance. *See id.*; *Braughton*, 569 S.W.3d at 608; *Hooper*, 214 S.W.3d at 13. Therefore, the jury had sufficient evidence from which to conclude beyond a reasonable doubt that Patterson attempted to commit the offense of theft in the aggregate amount of $200,000 or more. *See* TEX. PENAL CODE ANN. §§ 15.01(a), 31.03; *see Padilla*, 326 S.W.3d at 200. We overrule Patterson's last issue on appeal.

## V. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 23rd
day of January, 2020.

58